IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER DIXON,

                Petitioner,

      v.

TOM CAREY,

                Respondent.

NO. C05-2862 TEH

ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS

## I. INTRODUCTION

This matter comes before the Court on the petition of Christopher Dixon for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  After conducting an initial review, the Court concluded that the petition stated cognizable claims under § 2254 and ordered Respondent, Tom Carey, to show cause as to why the petition should not be granted.  Respondent filed an answer contending that the petition should be denied, and Dixon filed a traverse.  Upon careful consideration of the record, the parties' arguments, and governing law, the Court DENIES habeas relief for the reasons discussed below.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The California Court of Appeal's opinion described the facts and evidence presented in this case as follows:

> *Prosecution Case*
> Geevarughese Philipose lived in a three-bedroom house in San Carlos with his wife, Molly, and their two sons, who were 8 and 4 years old at the time of trial.  Molly worked as a nurse on the 4:00 p.m. to 12:30 a.m. shift.  She was at work when Geevarughese went to bed at

1

10:00 p.m. on March 7, 2001.  The Philiposes's older son was asleep in his own bedroom and their younger son was with Geevarughese in the master bedroom.

On March 8 at 12:45 a.m., Geevarughese woke up and saw a man he did not recognize standing in the bathroom of the master bedroom.  Realizing Geevarughese was awake, the man came to the side of the bed and started punching him all over his side, head, and face.  Geevarughese's younger son woke up and started crying.  The man asked Geevarughese to get his wallet.  Geevarughese truthfully told him the wallet was in another bedroom.  The man cut part of the T-shirt Geevarughese was wearing and used it to tie his hands.  He led Geevarughese into the living room where he told him to lie down on the floor.  The man took the night garment Geevarughese was wearing, tore it into strips, and tied Geevarughese's hands, legs, and mouth.  He got leather belts from another room and tied Geevarughese's hands and legs more securely with them.  Lying on the living room floor, Geevarughese could hear the man pulling out drawers and taking things out of the closet.

Molly arrived home from work at approximately 12:50 a.m. on March 8 and parked her car in the street in front of the house.  She noticed no unusual cars parked or moving in the vicinity of her house.  As Molly opened the front door with her key, she heard her husband making a strange sound from somewhere in the living room.  Immediately after she entered, a man she did not recognize came at her from the master bedroom and attacked her.  The purse, shoes, and lunchbox she had been holding scattered and she fell to the ground.  The man began kicking her in the head and face.  It was very painful and she cried out repeatedly: "Help. Help. Help."  The man ran out through the open front door.  Molly was never able to see him in a good light.

Molly rushed to close and lock the front door.  After using a kitchen knife to untie her husband, she called 911.  She was bleeding from her mouth, and feeling pain in her head, jaw, face, and eyes.  An X-ray the next day showed that her lower jaw was fractured.  At the time of trial, 14 months later, Molly could chew but biting was difficult and she was still experiencing pain on the left side of her head.

Officer Buelow responded to the scene just after 1:00 a.m.  He saw no pedestrians near the house.  Inside, the house had been ransacked.  Clothes were scattered on the floor and drawers were open.  A glass vase with American and Singaporean coins had been removed from the closet and the coins spread out on the bed.

Examining the outside of the house, police found that a garage door was open and screens had been pried from several windows.  Geevarughese noticed that a screwdriver and wrench were missing from a box he kept in the garage.  A stool was stacked on top of a lawn chair below the window of the master bathroom.  Bottles of shampoo and soap were stacked on the ground nearby.  When Geevarughese looked over the house and garage, he concluded that the man had come in through the master bathroom window.  A police officer testified that the burglar could have crawled through the window above where the lawn chair and stool were stacked.

Two strips of tape had been stuck on the outside of the Philiposes's older son's bedroom window.  A matching roll of clear adhesive tape was sitting on the ledge.  The window was a two-sided horizontal sliding window in which one side was fixed and the other

slid along a track to open and close.  A police expert testified that it appeared someone had attempted to pry the window open and that the tape had been placed there to deaden the sound or prevent the glass from shattering.  The window had been cracked underneath the tape.  The Philiposes described the intruder as a Caucasian male, under 30 years of age, with a thin face and no glasses.  He was wearing a white T-shirt with a dark vest, long pants, and a dark cap with no sunshade in front, like a baseball cap turned backwards.  Molly worked with a police sketch artist to help him make the sketch, but she did not think the completed sketch was a close match to the intruder.

The crime lab processed the strips of clear packing tape found on the older son's window for latent prints.  Seventeen prints were found on the sticky side of the tape.  Sixteen of these were identified as defendant's.  The 17th print could neither be positively identified as defendant's nor could he be excluded as its source.

As a result of the fingerprint identification, defendant was arrested on March 10, 2001.  He was taken into custody approximately a block and a half from the Philipose home as he was about to drive away in a car registered to his girlfriend, Rosanna Perry.  Defendant was wearing a baseball cap turned backwards.  His right pinky and ring fingers were injured and were bandaged with a splint holding the two fingers together.  Police found a roll of masking tape on the driver's side front floorboard, and a flashlight on the driver's seat.  On the passenger side, they found a screwdriver, crescent wrench, and black beret-style cap.  A Singaporean 20-cent piece like those Geevarughese kept in the glass vase was found on the rear seat.

The Philiposes viewed defendant in a field show up 30 minutes after his arrest.  Geevarughese was 50 percent sure defendant was the intruder.  Molly was 70 to 80 percent sure.  Following defendant's arrest, Officer Richard Dickerson asked Molly and Geevarughese individually whether either of them had bitten the intruder.  Both responded negatively.  The next day, Molly called Dickerson and told him she now remembered that she did bite the intruder's finger when he first grabbed her and put her on the floor.  A forensic dentist testified at trial that the injuries to Molly's mouth and to defendant's finger were consistent with Molly having bitten the defendant.  According to the witness, defendant's hand injuries were not consistent with being cut by punching a windshield or coming in contact with a broken crack pipe.

Defendant gave a statement to police denying that he burglarized the Philipose house.  He stated that he had gotten into a fight with his girlfriend and had been sleeping in his car and staying in a vacant apartment in the same complex his girlfriend lived in, located within a block of the Philipose residence.  He stated that he had injured his finger two or three weeks earlier, and mentioned that he had hit the windshield of his girlfriend's car two weeks earlier because he had been angry about his girlfriend sleeping with another man.  Rosanna Perry initially told police that she first noticed an injury to defendant's finger on the morning of March 8.  Defendant told her he had been in a bar fight with a man who bit his finger.  At the preliminary hearing, Perry testified that she first saw the injury on March 7, and that defendant first told her he had been in a bar fight and later said the injury was caused by broken glass when he was trying to retrieve drugs that had fallen on the carpet.

At a live line-up after defendant's arrest, Molly picked defendant out as the "possible" perpetrator.  Geevarughese thought that

3

both defendant and another man resembled the intruder.  At trial, Molly and Geevarughese testified there were similarities between defendant and the intruder, including his age, height, build, and skin color, but they could not identify defendant with 100 percent certainty.

At trial, Geevarughese identified the screwdriver and wrench as the tools taken from his garage on March 8.  He could not positively identify the beret found in the defendant's car as the one the intruder was wearing, but the vertical stitching on the beret was similar to that shown on the sketch artist's drawing of the intruder.  The sketch artist testified that he would not have shown vertical striations in his sketch of the cap unless the Philiposes had described that to him.

*Defense Case*

Defendant had shown Officer Dickerson a receipt for a tax refund he received on or about the day of the incident to show that he was not in need of money.  Defendant's friend, Scott Croce, testified that defendant and Perry came over to Croce's house in Sunnyvale at 10:30 p.m. on March 7, 2001 and stayed until approximately midnight or possibly as late as 12:30 a.m.[2]  He recalled that defendant had told him that he had taken his taxes into H & R Block that day and asked Croce if he could use Croce's house as the mailing address for the refund he was expecting.  It was stipulated that it would take 20 to 25 minutes to drive from Croce's house to the Philipose residence.

An H & R Block employee testified that defendant had his taxes prepared and applied for a loan against his expected federal refund in the Sunnyvale office on March 7, 2001.  He returned the next day to pick up a check for $867.05, which reflected his refund less fees for tax preparation and the loan.

Defendant's friend, Michelle Cocchi, testified that she was present when defendant injured his finger a week or two before her March 13 birthday in 2001.  Cocchi testified that defendant lost his temper and struck a windshield after learning that Perry had been unfaithful to him.  Perry's mother testified that she had used the car defendant was arrested in until February 2001, and that her husband had placed tools in the car that could have included those Geevarughese had claimed were his.  She further testified that the Singaporean coin found in the car could have been hers because she kept a jug of coins in the car that included coins from other countries, including Singapore.  Croce, Cocchi, and Perry's mother all testified defendant was clean-shaven during the time period of the crime.  Defendant was clean-shaven at the time of his arrest.  According to the Philiposes, the intruder had a French beard or goatee.  The police sketch artist testified that he would not have released the picture if Molly and Geevarughese had told him it did not resemble the suspect.

---

[2]On rebuttal, the prosecution produced a letter defendant wrote from jail to a friend directing the friend to tell Croce's wife to say that defendant was at her home on the night of March 7.

*People v. Dixon*, No. A102305, slip op. at 2-7 (Cal. App. May 10, 2004) (available at 2004 WL 1045924) (Resp't Ex. G).

On June 13, 2002, a jury convicted Dixon of the following crimes: (1) residential burglary in violation of Penal Code section 460, subdivision (a), with special allegations that Dixon personally inflicted great bodily injury under sections 1203.075 and 12022.7, subdivision (a), and that the offense was a violent felony under section 667.5, subdivision (c)(21); (2) false imprisonment in violation of section 236; (3) robbery of an inhabited residence in violation of section 212.5, subdivision (a), with special allegations that Dixon personally inflicted great bodily injury under sections 1203.075 and 12022.7; (4) battery resulting in serious bodily injury under section 243, subdivision (d), with a special allegation that Dixon inflicted great bodily injury within the meaning of section 1192.7, subdivision (c)(8); and (5) receiving stolen property in violation of section 496, subdivision (a).  Clerk's Tr. at 7-11, 209-15 [hereinafter "CT"] (Resp't Ex. A).

The prosecution also alleged that Dixon had prior convictions that qualified for sentence enhancements under California's "Three Strikes Law," California Penal Code section 667, subdivisions (b)-(i).  On March 24, 2003, after Dixon waived a jury trial on the prior conviction allegations, the trial court found that: Dixon had been convicted of four felonies within the meaning of Penal Code section 1203, subdivision (e)(4); that Dixon committed a violent or serious felony while he was on state prison parole under Penal Code section 3000, within the meaning of Penal Code section 1203.085, subdivision (b); that Dixon had four felony convictions within the meaning of Penal Code section 1170.12, subdivision (c)(2); that Dixon had one serious felony conviction within the meaning of Penal Code section 667, subdivision (a); and that Dixon had served two prison terms within the meaning of Penal Code section 667.5, subdivision (b).  CT 11-14, 90, 399-400.

On April 4, 2003, the trial court sentenced Dixon under California's Three Strikes Law as follows: consecutive terms of 25 years to life as to counts one and three; sentences stayed under Penal Code section 654 as to counts two, four, five; an additional 3 years for the special allegation under Penal Code section 12022.7, subdivision (a), as to count three; an additional 5 years for the prior conviction allegation under Penal Code section 667,

subdivision (a); and an additional 4 years (2 years each) for the two prior conviction allegations under Penal Code section 667.5, subdivision (b). CT 399-414.

Dixon appealed his conviction to the California Court of Appeals. The appellate court remanded the case to reduce the section 667.5 enhancements to one year each, but the court otherwise affirmed Dixon's conviction and sentence. Resp't Ex. G at 17. Dixon then appealed to the California Supreme Court, which denied review. Resp't Ex. I.

On July 13, 2005, Dixon timely commenced this federal habeas action under 28 U.S.C. § 2244(d)(1), asserting the following grounds:

> (1) The trial court's exclusion of evidence concerning a third-party suspect violated Dixon's due process right to present a defense;
>
> (2) The trial court's refusal to order the fingerprinting of a third-party suspect violated Dixon's due process rights; and
>
> (3) Dixon's 1986 juvenile adjudication of robbery could not be used as a "strike" because Dixon did not have the right to a jury trial in the juvenile court proceeding.

The Court addresses each of these arguments in turn below.

## III. JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. This action is in the proper venue because the challenged conviction occurred in San Mateo County, California, which is located within this judicial district. 28 U.S.C. § 2241(d).

## IV. EXHAUSTION OF STATE REMEDIES

A state prisoner must exhaust all remedies available in the state courts on each ground before a petition for a writ of habeas corpus may be considered by a federal court. 28 U.S.C. § 2254(b)(1)(A); *see Coleman v. Thompson*, 501 U.S. 722, 731 (1991). The parties do not dispute that Dixon has exhausted all of his available state remedies as to all grounds, and the

Court is satisfied that Dixon has afforded the state courts a full and fair opportunity to review his claims.

## V. LEGAL STANDARD

The Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Dixon's petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 409-12 (2000) (O'Connor, J., concurring and delivering the opinion of the Court on this point).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The source of "clearly established law" is limited to the "[Supreme] Court's jurisprudence." *Id.* at 412.

The writ for habeas relief may not be granted simply because the district court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Instead, the district court

1   must determine whether the state court's application of clearly established law was

2   "objectively unreasonable." *Id.* at 409; s*ee also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)

3   In "assessing whether an application of federal law is objectively unreasonable, courts will

4   often have to engage in an intensive fact-bound inquiry highly dependent upon the particular

5   circumstances of the given case." *Chia v. Cambria*, 360 F.3d 997, 1002 (9th Cir. 2004).

6   "Although only Supreme Court law is binding on the states, our Circuit precedent remains

7   relevant persuasive authority in determining whether a state court decision is objectively

8   unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2004)

9       In addition, to obtain habeas relief on the basis of an evidentiary error, a petitioner

10  must show not only that the error was one of constitutional dimension but also that the error

11  did not have a "substantial and injurious effect or influence in determining the jury's

12  verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  The "harmless-error standard"

13  applies to all habeas claims that argue a "constitutional error of the trial type." *Id.* at 638.

14

15  **VI.  DISCUSSION**

16       **A.  Exclusion of evidence concerning Jeffrey Nichols**

17       Dixon's first claim alleges that the trial court's exclusion of evidence concerning

18  Jeffrey Nichols violated Dixon's due process right to present a defense.  At the in limine

19  hearing before the trial court, Dixon attempted to introduce a police sketch prepared by the

20  victims, a photo of Dixon, and a photo of Nichols.  Dixon then argued that the sketch

21  resembled Nichols more than himself in several facial features, including shape of the eyes,

22  hair, facial hair, and jawline.  In addition, Dixon attempted to submit evidence that Nichols

23  had a motive to falsely implicate Dixon, including evidence of an ongoing dispute between

24  Nichols and Dixon and evidence that Nichols said he was "going to get" Dixon.  Lastly,

25  Dixon wanted to present evidence that Nichols had committed an alleged "break-in" near the

26  Phillipose house.  Dixon sought to use all of the above evidence to show that Nichols could

27  have planted Dixon's fingerprints at the crime scene and that Nichols also had a motive to do

28  so.  The trial court excluded all evidence concerning Nichols because the link between

1   Nichols to the perpetration of the crime was insufficient.  Rep.'s Tr. 44-63 (Resp't Ex. B).

2   Subsequently, the state appellate court affirmed the trial court's ruling and concluded that the

3   probative value of the proffered evidence was outweighed by its potentially prejudicial

4   effect.  Resp't Ex. G at 10.

5       The exclusion of evidence does not violate the Due Process Clause unless "it offends

6   some principle of justice so rooted in the traditions and conscience of our people as to be

7   ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (quoting *Patterson*

8   *v. New York*, 432 U.S. 197, 201-02 (1977)) (internal quotations omitted).  However, a

9   defendant does not have an unfettered right to offer evidence that is incompetent, privileged

10  or otherwise inadmissible under standard rules of evidence.  *Id*.  Petitioner bears the burden

11  of demonstrating that a fundamental principle of procedure was violated when seeking

12  habeas relief.  *Patterson*, 432 U.S. at 202

13      One of the fundamental rules that may be violated by the erroneous exclusion of

14  critical, corroborative defense evidence is the Sixth Amendment's right to present a defense.

15  *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing *Chambers v. Mississippi*,

16  410 U.S. 284, 294 (1973)).  When deciding whether the exclusion of evidence violates this

17  right, a court balances the following factors: the probative value of the excluded evidence on

18  the central issue; the reliability of the evidence; the capability of evaluation by the trier of

19  fact; the cumulativeness of the evidence; and the importance of the evidence in defendant's

20  attempted defense.  *Chia*, 360 F.3d at 1003.  A defendant must also show that "his interest

21  clearly outweighs the state's before we will interfere with routine procedural matters." *Perry*

22  *v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).

23      Here, Dixon claims that the excluded evidence would have been a major part of his

24  attempted defense because it would have established a link between the crime scene and

25  Nichols, thereby supporting Dixon's theory that he was framed by Nichols.  However, none

26  of Dixon's arguments on this point is persuasive because the evidence Dixon sought to

27  introduce was unreliable and not probative of critical facts.

28

First, Dixon claims that the police sketch of the perpetrator resembled Nichols and did not resemble Dixon.  However, the accuracy of the police sketch is in question because the victims had a limited opportunity to observe the perpetrator; even Molly Philipose admitted that the sketch was not an accurate depiction of the intruder.  In addition, the probative value of the police sketch is also lessened because the victims selected Dixon in person with some confidence in both the field show up and the later line-up identification.

Second, Dixon claims that Nichols had motive because the evidence would have shown that Dixon failed to return Nichols's jacket and, therefore, Nichols wanted to retaliate by framing Dixon.  However, as the state appellate court noted, this motive is speculative, and there is no evidence supporting why Nichols would go about his revenge in such a circuitous or serious manner.

Third, Dixon claims that Nichols allegedly committed a similar break-in at an apartment in the same neighborhood three days before the burglary of the Philiposes' house, therefore showing modus operandi.  However, as the state appellate court noted, Nichols's alleged break-in was not similar to the crime at issue here.  In the earlier instance, Nichols forced his way into the apartment to retrieve his own belongings, and he left without attacking the residents or taking any of the residents' belongings.  Nichols's previous alleged break-in is therefore insufficient to show modus operandi, as Dixon asserted.

Moreover, Dixon has not shown that his interests clearly outweigh the state's.  The state's interests in preventing confusion to the jury and wasting time were substantial in this case:  All of the excluded evidence was unreliable and non-probative of the critical facts, while none of the excluded evidence sought to explain the highly inculpatory evidence against Dixon.  Dixon's proffered evidence would not, for example, have proven why and how Dixon's fingerprints were found on the adhesive tape at the scene of the crime.  In addition, the excluded evidence was speculative because there were no plausible links between Nichols and the crime scene except the fact that a police sketch *could* have resembled Nichols.  In light of all of the above, this Court does not find the exclusion of evidence regarding Nichols to have been objectively unreasonable.

10

1      Furthermore, even assuming that excluding evidence regarding Nichols was

2  constitutional error – which the Court does not find in this case – the error was harmless

3  under *Brecht*, 507 U.S. at 637.  The state appellate court noted, and this Court agrees, that

4  Dixon has not demonstrated that the admission of the excluded evidence regarding Nichols

5  would have had a "substantial and injurious effect or influence in determining the jury's

6  verdict" because of the substantial circumstantial evidence inculpating Dixon in this case:

7  The wrench and screwdriver from the victim's house was in the car that Dixon drove; a

8  Singaporean coin linked to the house was found within the car that Dixon drove; Dixon's

9  hand injuries were consistent with Molly Philipose's bite; Dixon gave contradictory

10 explanations of the hand injuries; and 16 out of 17 fingerprints at the scene of the crime

11 matched Dixon's.  *Id.*  Thus, any error in excluding evidence of Nichols would have been

12 harmless under *Brecht*.

13     Accordingly, Dixon is not entitled to habeas relief based on his claim that the trial

14 court's exclusion of evidence regarding Nichols violated Dixon's due process right to present

15 a defense.

16

17     **B.  Refusal to order the kinderprinting of a third-party Nichols**

18     In his second claim, Dixon contends that the refusal to issue a discovery order for

19 kinderprinting of Nichols violated Dixon's due process rights to compulsory process and to

20 present a defense.  Following the jury verdict, Dixon moved the trial court to compel

21 kinderprinting of Nichols on the grounds that one latent fingerprint was found on the vanity

22 of the Philiposes' bathroom which did not match Dixon's.[1]  At the time of the trial, Nichols

23 was on probation, which subjected him to searches and seizures.  In considering the motion

24 to compel kinderprinting, the trial court found that Nichols did not waive his Fourth

25 Amendment rights for all purposes and denied Dixon's motion because it determined that

26 Dixon failed to present sufficient evidence connecting Nichols to the crime.  The state

27 ───────────────

28      [1]Kinderprinting is a more detailed and accurate form of fingerprinting that allows
more complete ridge detail to be taken from the hand and fingers.

11

1  appellate court found that the trial court's refusal to kinderprint was not an abuse of

2  discretion because of the lack of factual support inculpating Nichols. *See supra* at 9-10

3  (discussing the speculative link of Nichols to the crime scene).

4      Here, Dixon cites, among other cases, *United States v. Euge*, 444 U.S. 707 (1980), and

5  *Schmerber v. California*, 384 U.S. 757 (1966), for the proposition that the court has the right

6  to compel fingerprinting of a third party.  However, Dixon cites no authority to support his

7  argument that refusing to compel kinderprinting of Nichols rises to the magnitude of a

8  constitutional violation.  The trial court may have had the right to compel fingerprinting, but

9  that does not mean that it was error for the court to refuse to exercise that right.

10     The United States Supreme Court has recognized that fingerprinting a suspect is not

11 unconstitutional under the Fourth Amendment if, at minimum, "there is *reasonable suspicion*

12 that the suspect has committed a criminal act . . . "  *Hayes v. Florida*, 470 U.S. 811, 817

13 (1985) (emphasis added).  Here, there was no credible evidence linking Nichols to the crime

14 scene, let alone enough evidence to constitute reasonable suspicion that Nichols committed

15 the crimes that Dixon was convicted of.  It was therefore not objectively unreasonable for the

16 trial court to have refused to compel kinderprinting of Nichols.

17     In addition, even assuming that the trial court erred by refusing to compel Nichols to

18 kinderprinting, such error would have been harmless under the *Brecht* standard.  For the

19 reasons discussed above as to other inculpating evidence presented at trial against Dixon, the

20 Court finds that the refusal to compel kinderprinting would not have had a substantial and

21 injurious effect on the jury's determination.  Accordingly, Dixon is not entitled to habeas

22 relief based on his claim that the trial court's refusal to order kinderprinting of Nichols

23 violated Dixon's due process rights to compulsory process and to present a defense.

24

25     **C.  Construing Dixon's 1986 juvenile adjudication of robbery as a "strike"**

26     Finally, Dixon contends that he was denied his Sixth Amendment right to a jury trial

27 because the trial court found that he suffered a prior "strike" conviction based on a juvenile

28 court adjudication.  In this petition, Dixon reiterates the same arguments he made in the state

1    appellate court, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States* v.

2    *Tighe*, 266 F.3d 1187 (9th Cir. 2001).  Furthermore, he contends that *Shepard v. United*

3    *States,* 544 U.S. 13 (2005), now reflects clearly established United States Supreme Court

4    precedent holding that nonjury juvenile adjudications cannot be used for sentence

5    enhancements.

6           In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction,

7    any fact that increases the penalty for a crime beyond the prescribed statutory maximum must

8    be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.

9    In interpreting *Apprendi*, the Ninth Circuit in *Tighe* held that the trial judge's use of a

10   defendant's prior nonjury juvenile adjudication to increase the statutorily mandated

11   maximum punishment violated defendant's right to jury trial because the use of prior

12   convictions for sentence enhancements are "limited to prior convictions resulting from

13   proceedings that afforded the procedural necessities of a jury trial and proof beyond a

14   reasonable doubt."  *Tighe*, 266 F.3d at 1194.  The *Tighe* court went on to hold that

15   "[j]uvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-

16   doubt burden of proof, therefore, do not fall within *Apprendi*'s 'prior conviction' exception."

17   *Id*.

18          California courts have disagreed with the majority opinion in *Tighe* by holding that

19   *Apprendi* does not preclude the use of nonjury juvenile adjudications for sentencing

20   enhancements.  *See*, *e.g., People v. Superior Court (Andrades)*, 113 Cal. App. 4th 817, 833-

21   834 (2004); *People v. Bowden*, 102 Cal. App. 4th 387 (2002).  Similarly, the Third and

22   Eighth Circuits have disagreed with *Tighe* by holding that nonjury juvenile adjudications can

23   be used to enhance a defendant's sentence.  *United States v. Jones*, 332 F.3d 688, 696 (3d

24   Cir. 2003); *United States v. Smalley*, 294 F.3d 1030, 1033 (8th Cir. 2002).  The United States

25   Supreme Court has yet to resolve the differing interpretations as to whether nonjury juvenile

26   adjudications can be used for sentence enhancements.

27          Although *Tighe* continues to be the law in this circuit, the Ninth Circuit recognized in

28   2004 that *Tighe*'s opinion as to nonjury juvenile adjudications did "not represent clearly

13

established federal law 'as determined by the Supreme Court of the United States.'" *Boyd v. Newland*, 393 F.3d 1008, 1017 (9th Cir. 2004). In *Boyd*, a habeas petitioner contended that a state trial court violated clearly established federal law by using a nonjury juvenile adjudication to increase his sentence. *Id*. at 1016. There, the court held that "in absence of explicit direction from the Supreme Court, we cannot hold that the California courts' use of Petitioner's juvenile adjudication as a sentencing enhancement was contrary to, or involved an unreasonable application of, Supreme Court precedent." *Id*. at 1017. The court therefore denied Boyd's request for habeas relief based on the precise claim that Dixon now asserts here. *Id*.

Dixon submits, however, that he is not bound by the Ninth Circuit's decision in *Boyd* because the United States Supreme Court's decision in *Shepard v. United States* clearly establishes that nonjury juvenile adjudications cannot be used for sentence enhancements. 544 U.S. 13 (2005); *see* Petitioner's brief at 18 (stating that "*Shepard* has now established that prior convictions do not fall outside of the *Apprendi* jury trial right"). Contrary to Dixon's assertions, however, *Shepard* does not address whether nonjury juvenile adjudications necessarily fall within or without the *Apprendi* "prior conviction" exception. In *Shepard*, the Supreme Court addressed the kind of evidence that a court sentencing under the Armed Career Criminal Act 18 U.S.C. § 924(e) ["ACCA"] can look to for determination of sentence enhancements. *Shepard*, 544 U.S. at 1263. The Court held that in determining whether a guilty plea to burglary as defined by a nongeneric statute necessarily admitted elements of the generic offense, a court is limited to examining evidence like the charging documents and jury instructions, but not the underlying police reports, complaint applications, or the like.[2] *Id*. at 1257, 1263. Thus, the *Shepard* court only addressed the evidentiary limits of what a court may look to when applying sentence enhancements under

---

[2]The ACCA makes burglary a violent felony only if committed in a building or enclosed space, but not in a boat or motor vehicle ("generic burglary"). Some States define burglary more broadly, as by extending it to entries into boats and cars ("nongeneric burglary").

1   the ACCA.  The *Shepard* court did not mention *Tighe*, nor did it clearly establish that

2   nonjury juvenile adjudications cannot used for sentencing enhancement.

3          In light of the above, *Shepard* does not apply here, nor does *Shepard* disturb the

4   holding of *Boyd v. Newland*.  Thus, the Court finds *Boyd* controlling and follows *Boyd* in

5   holding that *Tighe's* view regarding nonjury juvenile adjudications does not reflect clearly

6   established Supreme Court precedent.  Accordingly, this Court does not find that the use of a

7   prior nonjury juvenile adjudication to increase Dixon's sentence under California's Three

8   Strikes Law was contrary to, or involved an unreasonable application of, clearly established

9   Supreme Court precedent, and Dixon is therefore not entitled to habeas relief on this claim.

10

11  **VII. CONCLUSION**

12         For all of the reasons discussed above, Dixon has failed to show that trial error or

13  sentencing error warrants habeas relief in this case.  Accordingly, Dixon's petition for a writ

14  of habeas corpus is DENIED, and the Clerk shall close the file.

15

16  **IT IS SO ORDERED.**

17

18  Dated:   03/09/06                                          _____

19                                                            THELTON E. HENDERSON, JUDGE
                                                              UNITED STATES DISTRICT COURT

20

21

22

23

24

25

26

27

28

15